My name is Olumide Obayemi. In a nutshell, this case is about the findings of the immigration judge in San Francisco. First of all, we'd like to refer the court to the certified administrative record at page 49-51. In that, on those three pages, we can find that the I.J., the immigration judge, was in a position to deny the appeal for asylum and retorting of remover on two points. That the petitioner mentioned two different dates as the date of her father's death, and that she mentioned that the police never came to her house back in India. Your Honor, without belaboring the issue, so as to save time, I would like to point the court to page 177-181 of the certified administrative brief, which is the record of the asylum officer on which these findings are based. At the bottom of page 177, we will see the questions which, as I did that in my brief, Your Honor, the question which the officer posed to the How many different dates did your client give for the death of her father? Your Honor, where? In the court or at the asylum office? Anywhere. Your Honor, I would like to answer that question with respect, Your Honor. I would like to answer that question directly. But in this case, we No, no, no. Answer it directly. Your Honor, based on the fact that I contest the competences of interpretation, I do not attach any weight to what to the asylum officer's notes. I will refer I will only rely on what was said at the hearing, which is at page page 114. You know, you're asking us, are you not, to reweigh the evidence. And we now have substantial evidence in the, before the immigration judge, that your client gave many different dates for the death of her father. The first question is how many. Now, I know you don't accept them, but accepting them as they're in the record, how many different dates were there? Based on the record, Your Honor, based on the court, the hearing before the court, one. The hearing before the court, one. Yes. The hearing before the immigration judge, one. But I didn't ask at the hearing. There are many different dates in the record that I see that were given by your client. That is, Your Honor, with respect, Your Honor, that is why we are here today. We contest that interpretation, the level of translation used. We do not believe Did you attack the integrity of the translation before the immigration judge, your side? Your Honor, The answer is no. No, Your Honor. You see, these things are not done piecemeal. If you have a problem with the translator, that has to be brought up with the immigration judge. The translator was, during the conversation, well, then somebody has to bring it up there so that can be resolved. We're not able to resolve that in an appellate court level. This is a petition, you know, in front of an appellate court. We are asking the court to look at the record. If there are grounds not to rely on the resume, that appellant gave different dates. If the notes satisfy, if they are well made, if they are competently made, in this case, the notes themselves are ambiguous, so we cannot say that the appellant You're trying to contrast the notes with the testimony of Mr. Sebastian. That's a matter that should be done before the immigration judge. The immigration judge accepted the testimony, as a matter of fact, and identified a number of different dates that your client gave for the death of her father. Before the Now let me ask you the next question, because I obviously, we're not going to get anywhere. You're just not going to concede that there's more than one date. But what does that matter? So what if there are different dates? And I'm telegraphing to the other side for the death of the father. Why is that material in terms of credibility? Yes, Your Honor. We are, we are, as I mean, we are, we don't believe, Your Honor, because we don't believe it's material, because the appellant actually gave the right date at the hearing. Well, even if the dates of her, the variation in the dates of her father's death don't matter, she also testified that nobody came looking for her, for her father or her brother or anybody else, and she testified that they did. Now, that inconsistency, it seems to me, does go to the heart of an asylum claim, because it, her entire claim turns on the fact that her husband got the authorities irritated at him. Are we looking at, Your Honor, respectfully, may I point you to page 77 of the hearing of the, of the, of the certified record? Appellant clearly stated at page 77 that, that the police came, may I use that word, Your Honor, page 77 of the certified record, Your Honor. Yeah, I've read it. Yes. In our words, it said, no, the police used to come to my parents' place, but I was not arrested. That is our position here today, that appellant. The, your position comes down to the fact that it was improper for the immigration judge to consider what your client testified, told the asylum officer. Because at various times, my client clearly denied that she said that. Well, she said both sides of the story. I mean, that's all. It was an inconsistency. She said they did, and she said they didn't. At the hearing, she said she didn't say that. I know at the hearing, but what your, at the, to the asylum officer, she said something different from what she said at the hearing. So your position must come down to, to whether it was proper to consider the asylum officer's testimony. Yes, that is our, that is the course of argument. Okay. What is the best case that you've got for the proposition that it was improper for the immigration judge to consider inconsistencies between what she told the asylum officer and what she testified to at the hearing? Your Honor, we, the, your Honor, if you, if your Honor could kindly look at page 92 of the certified administrative record. I'm not talking about the record now. My question is, what is your best legal authority for the proposition that it was inappropriate for the I.J. to consider what she said to the asylum officer? We've cited numerous cases in our brief, Your Honor. We mentioned the case of Ballast Submarine. Yeah. And speaking of that case, that is a Third Circuit opinion. And in your brief, 19 times you cited that case as a Ninth Circuit opinion. Do you have an explanation for why that occurred? One second, Your Honor. One second, Your Honor. Oh, yes, Your Honor. It's a Third Circuit decision, Your Honor. I realize that it's a Third Circuit opinion, but your brief, 19 separate times, referred to it as a Third Circuit opinion. Now, maybe that was a typo. Third Circuit opinion. It's a Ninth Circuit opinion. Possibly that's a typo. It definitely is, Your Honor. Well, I want to just urge you that that is also extremely misleading. Oh, sorry, Your Honor. Because when you read a brief and you see that a case is decided by this Court, we're bound by it. We are not bound by what the Third Circuit does. There's a huge difference. It's a tough opinion, though. My suggestion to you and to your staff is that you be extremely careful about misciting cases. The same thing happened with respect to Maransars, whatever it is, which was also miscited as followed by the Ninth Circuit when that's not so. It's a Third Circuit decision, Your Honor. It's very important to be very up front in citations to the Court. I'm going to suggest also that perhaps you might want to save the rest of your time for rebuttal because the clock didn't start running. One last answer, Your Honor. The Respondent is uneducated, Your Honor, and that's the reason why she had to use an interpreter. And for her, for the adverse, even the government considers she's uneducated. And because she was uneducated, that was why she had to rely on an interpreter. And because the interpreter, the translator was not, the transition in this case and the we are so irregular, Your Honor, we believe that the Asamoah-Sars no should be jettisoned in this case. Okay. Mr. Cunningham. Thank you, Your Honors, and good morning. I'm John Cunningham from the Department of Justice appearing on behalf of the Attorney General. Let me begin by addressing the Court's question to my colleague, which is what's the best case for the Petitioner in this case, and that is the Singe case decided by this Court in April of this year, Judge Berzon writing for the Court. And the issue in that case, as it was in this case, is whether a referral, an assessment by an asylum officer was sufficiently reliable to provide substantial evidence that could support an adverse credibility finding. And the point I hope to persuade you on this morning is that all the indicators of unreliability that the Court found in Singe are not present in this case. The citation to Singe is 403, Fed 3rd, 1081. And I have a laundry list that I'd like to try to run through for you. In Singe, the Court noted that there was no evidence that the interview with the asylum officer took place under oath. Here we have that evidence, page 171 of the record. Second, the Court noted in Singe that there was no evidence that an interpreter or translator was present at the interview with the asylum officer. Here we have that evidence. There was an interview. There was a translator sitting in on the interview provided by the Petitioner herself. That is also at page 171 of the record. Third, the Court noted in Singe that there was no evidence that at the conclusion of the interview, the alien in that case was given a chance to summarize, supplement, correct, add to the statements that she had already given to the asylum officer. In this case, if you look at page 175 of the record, you'll see three typewritten questions that Officer Sebastian always worked from when he interviewed an asylum applicant. And they basically gave Ms. Cower an ample opportunity to say whatever she wanted to say to Officer Sebastian to correct or supplement or change what she told him. This, again, is page 175 of the record. Question one, have you completely understood the questions I asked you today through your interpreter, parentheses, if used? Answer, yes. Question 36, do you have any questions about the asylum process now? Answer, no. And third, perhaps most important, is there anything else at all that you want to tell me that will help me understand your request for asylum? Answer, no. So Ms. Cower had ample opportunity to give a full story, whatever she wanted to say, to Officer Sebastian at the interview. In Singe, the Court also was concerned that there appeared that the Petitioner and his counsel never saw the asylum officer's report until the immigration judge issued her decision in that case. The Court didn't use due process or unfair surprise, but that, I think, was at the root of the Court's concern. Here, the situation was entirely different. If you will look at pages 117 through 119 of the record, you'll see that these three exhibits, Exhibits 7, 8, and 9, which are Officer Sebastian's handwritten notes, his typewritten standard questions that he always worked from, and then his assessment to refer, Exhibits 7, 8, and 9, were provided to Petitioner's counsel at a hearing that took place on November 16, 2000. Officer Sebastian didn't actually testify until February 2002, 14 months later. There were some delays because of scheduling issues. But the Petitioner, the point here is that Petitioner and her counsel were unfairly surprised. In any way, they knew what was coming. And one of the reasons they knew what was coming was because the INS trial attorney had already used Officer Sebastian's assessment to refer in cross-examining Ms. Cower and in pointing out the inconsistencies. What difference does it make that she seems to have come up with different dates for the death of her father? The relevance, Your Honor, is that she said that at the memorial service for her father, her husband stood up and gave a speech in which he protested Sikh mistreatment. True, but why does that turn on the date? The importance is that it happened, isn't it? Yes. Ultimately, by not being able to give consistent dates as to when her father actually died, this confusion gave the immigration judge substantial reason to think that the father's death, perhaps, and certainly the memorial service and the speech never happened. She was not able to sort of locate the time that this happened. And that, I think, it was reasonable for the judge to say, well, in that case, I'm wondering whether any of what you've told me ever actually happens. You can't be straight as to when your father actually died. And as to that point, in Singe, the court reminded all of us that dates can be a rather slippery event. There was a lot of discussion in the court's opinion on psychological studies and law review articles that point out that sometimes when we think of an event, the date is the least important part of it. We can remember what happened and where it happened and who else. Why is it important here? Because of the father's – because of the speech that the husband allegedly gave at the memorial service that supposedly took place when the father died. And when the asylum officer was questioning Ms. Sebastian, she kept changing the dates as to when the father died. But she's consistent at the beginning and consistent at the end, isn't she? Yes. She sort of went A, B, and then back to A. Right. And when this – I actually haven't seen a case quite like this, Your Honor, but it asylum application and then tell story B to the asylum officer, you have a choice. You can either stick with story B when you testify before the immigration judge or, as in this case, you can go back to story A. But in either case, you'd better have a reasonable explanation as to why you told story B in the first place. You'd better be able to explain why your subsequent story is different from what you first said. Didn't she say I was confused, I was a fish out of water, I'm not used to this stuff, I was nervous? That's what she said. Now, the question is – Plausible. Yeah. Don't you think that's a pretty plausible explanation for someone in the position she was in? It's plausible, but the question is, was the immigration judge compelled to accept that explanation? Well, that goes to another part of this debate. What else can you point to in the record that – I take it the problem with the death of the father, as I read your Ninth Circuit law, is that one could think it doesn't go to the heart of the asylum issue. Is there anything more in the record that we could go to that would go to, as you put it, the heart of the asylum issue? Oh, certainly, Your Honor. There were two other major inconsistencies that Officer Sebastian mentioned in his assessment to refer. But only two mentioned by the I.J. It left one of those out. Go ahead. Okay. Well, the first one was she, in her asylum application, she testified that she was arrested once. Yeah. And the I.J. didn't talk about that. Okay. Only pointed to two. All right. The other one was whether the police came to the house at certain times. Yes. Why don't you talk about that one? All right. She claimed in her asylum application that the police harassed her family, her parents' house, came to the parents' house and harassed them when they were looking for her brother. Her brother had been arrested, she said, and then was released and was put on a sort of form of probation where he was supposed to report to the police station every so often. And after a while, he stopped doing that. And she said in her asylum application that they came to the house regularly and harassed her parents. She also said, and this is more relevant as to her, she also said that after the incident, the claimed incident, where the speech given by her husband at the funeral service, he was arrested, beaten, released from the hospital or escaped from the hospital, and the police would come to both her house and her parents' house looking for the husband. Now, this is important because it brings the campaign of claimed persecution close to home. It brings it close to her. It's her spouse now, not just her father or her brother, her spouse that's being targeted by the police. But when in talking to Officer Sebastian, she said, no, the police never bothered us. They never came to the house and neither came to my parents' house. They didn't come to our house. And Officer Sebastian said, well, you said in your asylum application that they did. And he said, why are you saying now that they didn't? I made a mistake. I was confused. Well, that's what she said. There seems to be some kind of a problem here. If you take a look at the assessment to refer on page 169, it says applicants stated that after her arrest and release in 1996, police never came. That's the assessment to refer. But then you look over at his handwritten notes on page 180, and it says after your husband was arrested. So it seems there's a difference between what his handwritten notes say and what he wrote in the assessment as to whose arrest we're talking about. Was it her arrest in 1996 or his arrest in 1999? The note says after your H was arrested. Yes. And he boils that down in the assessment to refer that after her arrest and release in 1996. Yeah. I see the point, Your Honor. The paragraph in the assessment to refer beginning finally, we're reading the same paragraph. It doesn't square up with the notes. Well, I think it compresses too much because the first paragraph speaks about her arrest and release in 1996. But she never said then that the police came to her in-laws' house. She wouldn't have then. But the last paragraph, she said she could not explain this response in light of her I-589, that's the asylum application assertion, that the police indeed came to the homes of her parents. That's the 1996 arrest. And the in-laws, by that time she was married, the police had arrested her husband, she claimed. There's the second reference, the police came and coming to the in-laws' house as well. So the in-law, when did she get married? After 1996, Your Honor. But I can't remember exactly when. I'm sorry. I can't help you on that point. But I agree with you that the assessment to refer compresses too much. It should have broken out. But I think that the notes are there. And the immigration judge, all three of these exhibits were admitted into evidence. The immigration judge was entitled to look at all three in reaching his conclusion that Officer Sebastian's testimony, which is the final point I'd like to make. I see my time is up. This is the factor that distinguishes this case from almost any of the others that either my colleague cited or the Singe case. In this case, the asylum officer testified. Thank you, Mr. Cunningham. Thank you, Your Honor. Good morning. Your Honor, you did ask me if I had authorities for my defense. One minute left. Yes. Did you ask me, my authorities are, the case is Baojie Singe against Ashcroft. The citation is on. We have that. Your opposing counsel gave it to you. Yes, Your Honor. And the second one is Martinez-Sanchez against INS 794-F, second. Martinez, of course, as we're seeing, was on an airport interview without a translator. This was not an airport interview. It was scheduled. And there was a translator. Yes. We're talking about whether those, assuming, whether those inconsistencies occur. Did they really go to the heart of their asylum claim? In this case, the court noted, the Ninth Circuit noted, that an inconsistency as to the date the patient joined a paramilitary group claiming that he had four children in oral testimony, while only noting two children in the written declaration, were trivial errors, not consisting of valid evidence. But what about the police did or didn't come to the house searching for people? Searching for people? Yes, Your Honor. In this case, the officer's notes, as I pointed out on page 5 in my brief, on page 180 of the certified emcee's record, the officer's note cannot clearly tell us what questions were asked. As you rightly mentioned, and as I said. The officer's notes don't have to. He told the I.J. what questions were asked. That was simply to refresh his recollection. No, we have, and my client testified on page 77 that they came to a house. So we have the officer's note and the applicant's, we have the officer's testimony and the applicant's testimony. You're asking us to re-weigh testimony. The question is whether the I.J.'s conclusion is supported by substantial evidence, not that we, not, this is not a do-over. And we have to look at on what basis. The officer testified that he reviewed those notes before he came to court. Therefore, his testimony in court was based on those notes. If the notes are 40, his testimony is 40. Therefore, only my client's testimony stands as the correct testimony before the court. Therefore, those inconsistencies don't go to the heart of the asylum claim. My client should be granted asylum, Your Honor. Thank you. All right. Thank you, counsel. The matter just argued will be submitted.
judges: Trott, Rymer, Plager